CITY AND COUNTY OF DENVER et al. v. NEW YORK TRUST CO. et al. SAME v. DENVER UNION WATER CO. et al.

(Circuit Court of Appeals, Eighth Circuit. May 19, 1911.)

Nos. 3,479, 3,480.

1. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.
    The trustee in a mortgage given by a corporation to secure its bonds has certain rights as the representative of the bondholders independently of the mortgagor, and may maintain a suit in a federal court for the protection of such rights arising out of contracts pledged by the mortgage from impairment by legislation of the state regardless of the citizenship of its mortgagor.

    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824; Dec. Dig. § 282.*

    Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purch. Co. v. Boston & M. C. C. & S. Min. Co., 35 C. C. A. 7; Earnhart v. Switzer, 105 C. C. A. 262.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WATERS AND WATER COURSES (§ 188*)—FRANCHISE TO WATER COMPANY—CONSTRUCTION OF CONTRACT.

The city of Denver, by an ordinance which was accepted and under which the company expended several million dollars, granted a franchise to a water company for 20 years, the limit of its power and also contracted to pay for the maintenance of fire hydrants. The ordinance provided that at the expiration of the term the city should have the right at its election to purchase the property of the company, its value to be appraised in case of disagreement, the company's franchise to then cease. By a following provision the city was given the right at its election to renew the franchise of the company at the end of the term for another 20 years with a reduced rental for its hydrants. *Held* that, in view of the nature of the business for which the franchise was granted, the shortness of the term, and the large expenditures which must necessarily be made and continued through the term to give adequate service in a young and rapidly growing city, such two provisions of the ordinance contract should be construed together as requiring the city to purchase the property at the end of the term, if it did not renew the franchise; it not having power to bind itself by a contract to renew, but having power under the statute to contract to purchase if it should choose not to renew.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 188.*]

3. WATERS AND WATER COURSES (§ 188*)—FRANCHISE TO WATER COMPANY—CONSTRUCTION OF CONTRACT.

A further provision in said ordinance that, while the consideration for the respective agreements of the city and company were upon each side the several agreements of the other, the several contracts and agreements should be deemed independent, with the same force and effect as if each section was contained in a separate ordinance cannot destroy all interrelation and dependency among the various parts of the ordinance, there being such a general relation and connection of context and subject-matter throughout the entire ordinance as to require the several parts to be construed in pari materia even if they were contained in separate ordinances.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 188.*]

4. CONSTITUTIONAL LAW (§ 127*)—OBLIGATION OF CONTRACTS—LAW IMPAIRING OBLIGATION.

An amendment of a city charter which impairs the obligation of a valid and subsisting contract previously made by the city is not the less a violation of the contract clause of the Constitution because under the state law such amendments are adopted by the electors and are not the acts of a legislative body.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325-341; Dec. Dig. § 127.*]

5. CONSTITUTIONAL LAW (§ 127*)—OBLIGATION OF CONTRACTS—IMPAIRMENT BY MUNICIPALITY.

The city of Denver by an ordinance granted a franchise to a water company for 20 years and also contracted for hydrant service at stated rentals during the term. It also contracted to purchase the property of the company at the end of the term at a value to be fixed by appraisers after it signified its election, or, in the alternative, to renew the company's franchise and contract for an additional 20 years, paying a reduced hydrant rental. Before the end of the term the city adopted a charter amendment by which it created a public utilities commission, with entire control over the subject of waterworks and water supply and which authorized the commission to purchase the property of the water company provided the company would accept a stated sum therefor in the bonds of the city, but if not directed that an election should be held to vote

bonds which should be used by the commission "to construct and put into operation a complete system of waterworks for supplying said city and its inhabitants with water for all uses and purposes." The company did not accept the offer, and an election was held and bonds voted for the construction of a municipal plant. *Held,* that the charter amendment was a direct impairment of the obligation of the contract, and was unconstitutional and void; and that the company and also its mortgagee as representing its bondholders were entitled to an injunction to restrain the violation of such contract by the carrying out of the plan of the amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325–341; Dec. Dig. § 127.*]

6. WORDS AND PHRASES—"ELECT."

The ordinary meaning of "elect" is to choose between alternatives.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2329–2336; vol. 8, pp. 7647, 7648.]

Appeal from the Circuit Court of the United States for the District of Colorado.

In Equity. Suit by the New York Trust Company and others, against the City and County of Denver and others, the Denver Union Water Company and the South Platte Canal and Reservoir Company. From orders granting preliminary injunctions on the bill and cross-bill of the water company, the City and County of Denver appeals. Affirmed.

Charles S. Thomas and Charles W. Waterman (Henry A. Lindsley, City Atty., George Q. Richmond, W. H. Bryant, George L. Nye, William P. Malburn and William A. Jackson, on the brief), for appellant.

Henry McAllister, Jr. (Joel F. Vaile, William N. Vaile, Underwood, Van Vorst & Hoyt, and J. Markham Marshall, on the brief), for New York Trust Co.

Gerald Hughes and Clayton C. Dorsey (William V. Hodges and A. M. Stevenson, on the brief), for Denver Union Water Co.

Before HOOK, Circuit Judge, and RINER and REED, District Judges.

HOOK, Circuit Judge. The New York Trust Company brought suit in the Circuit Court to enjoin the "city and county of Denver" in the state of Colorado and certain of its officers including the members of the Public Utilities Commission from issuing bonds and constructing a system of waterworks, for a decree that certain provisions of the municipal charter are in violation of the Constitution of the United States, for the specific performance of an alleged contract to purchase the existing waterworks system, and for general relief. The Denver Union Water Company, which is the owner of the existing system of waterworks, and the South Platte Canal & Reservoir Company, a subsidiary corporation whose stock is owned by the Water Company, were made parties defendant. The Circuit Court granted orders of temporary injunction on complainant's bill and a cross-bill of the Water Company. The case is here on appeal from those orders.

The complainant Trust Company and defendants the city and county

of Denver and the Water Company are the successors respectively of other similar corporations from whose acts the present situation arises, but for the purposes of this case they may be regarded as original contracting parties in all respects. The Trust Company is a corporation of New York, and is the trustee in a mortgage given by the Water Company to secure $8,000,000 of its bonds. The mortgage embraces all the property, real and personal, of the Water Company, including franchises, contracts, rentals, choses in action, and the right to receive the purchase price in case of sale to the municipality. The city and county of Denver which for convenience will be called the city, is a municipal corporation of Colorado, and its officers and the members of the Public Utilities Commission are citizens of that state. The Water Company and the South Platte Company are Colorado corporations. The property of the latter, which consists principally of a valuable improved source of water supply, is an integral part of the waterworks system, is in the possession of and being operated by the Water Company, and is incumbered by a mortgage securing $4,000,-000 of bonds subject to call. The cross-bill of the Water Company sets forth substantially the same facts as contained in the original bill of the Trust Company, but construes them to mean that the city elected, not to purchase its property as the Trust Company claims, but to renew its contract and franchise for an additional period of 20 years. It also contains a prayer for relief similar to that of the original bill, save that it asks that its right to a renewed contract and franchise be established. Applications for temporary injunction were submitted upon bill, cross-bill, and affidavits and the trial court entered orders on both pleadings temporarily enjoining the municipal defendants from issuing bonds and from taking any steps towards the construction of a waterworks plant, and, in case of the cross-bill, from interfering with the Water Company in the continued exercise and enjoyment of its rights under its original franchise.

[1] The appellants contend that the trial court was without jurisdiction of the suit, and that the bill and cross-bill are so manifestly without equity that temporary injunctions should not have been granted. Jurisdiction was invoked in the bill upon the ground of diversity of citizenship and also because the suit arose under the Constitution of the United States. As to the former, it is urged by the appellants that though the complainant, the Trust Company, is a citizen of New York and all the defendants are citizens of Colorado, yet the defendant Water Company, which is an indispensable party, should for jurisdictional purposes be aligned with its mortgagee, the complainant, and when that is done the requisite diversity of citizenship does not exist. It is also claimed that the Trust Company in seeking the specific performance of an alleged contract of sale between the Water Company and the city, both citizens of Colorado, is suing for the contents of a chose in action and by the judiciary act it is therefore under the same disability in respect of jurisdiction as its assignor or mortgagor the Water Company. It may be assumed that these contentions as to diversity of citizenship and the lack of jurisdiction on that ground are well founded, yet if it appears from the face of the bill that a fed-

eral question is fairly presented there would still be jurisdiction in the Circuit Court. The Trust Company as the representative of the bond holders has certain rights independently of its mortgagor, the Water Company, and is not concluded by the action or nonaction of the latter. Though possession, management and operation of the mortgaged property, with their usual incidents, remain with the Water Company, the derivative interest of the Trust Company is such as to entitle it to protection and to preserve the property pledged to it from unlawful injury or destruction; and if the wrong consists in legislation impairing the obligation of the mortgaged contracts and franchises it may invoke the jurisdiction of a circuit court of the United States regardless of the citizenship of its mortgagor. Mercantile Trust Co. v. Columbus, 203 U. S. 311, 27 Sup. Ct. 83, 51 L. Ed. 198.

[2] When a case claimed to arise under the contract clause of the Constitution is presented it is necessary to determine whether there is a contract, what its true construction is, and whether as so construed the obligation is impaired by subsequent legislation of the state or under its authority. Of these matters in their order. There is no question but that a contract was entered into between the city and the Water Company. It is embodied in the ordinance of the city, No. 44, of the year 1890, which was duly accepted by the Water Company, and by which it was granted the right to construct, maintain, and operate a system of waterworks to such extent as the city might lawfully grant the same, subject to termination as therein provided. According to the terms of the ordinance have the contract relations between the parties expired by lapse of time? When the ordinance was adopted, April 10, 1890, the city was without power to grant the Water Company an exclusive franchise or one for a longer period than 20 years. It did, however, have power under the existing law to construct and operate waterworks of its own, and also then to bind itself by contract to purchase the plant belonging to the Water Company when the franchise of the latter expired. The contract to purchase, which it was within the power of the city to make, might have been an absolute one or upon such conditions or alternatives as were mutually satisfactory. So far there is little, if any, controversy, and it may be conceded that the franchise of the Water Company as originally granted expired April 10, 1910, 20 years after the adoption of the ordinance. Briefly stated the contentions of the parties at this point of the case are as follows: The complainant Trust Company claims, and for that matter the Water Company also, that by the terms of the ordinance the city was bound at the end of the 20-year period either to purchase the waterworks system or to renew the contract with the Water Company for a like period but at a reduced hydrant rental. As already observed, the complainant and the Water Company differ as to the legal effect of what the city did under the alternatives stated. The former maintains the city elected to buy; the latter that it elected to renew the contract. On the other hand the city claims it was not obligated by the ordinance to do either and that it did neither.

When a water company assumes the duty of supplying a rapidly growing city and its inhabitants with water for a period of 20 years,

necessarily involving the expenditure of large sums of money, it is but natural that some consideration would be given by the parties to the status of the company and its property at the end of the period. A business of that character cannot be conducted from hand to mouth like that of a greengrocer, but provision for the public needs must be made many years in advance of actual demand, at least for an adequate water supply. There must be a large investment against future requirements. Especially is this so in a country like that in which Denver is situated where the problem is generally a difficult and expensive one. Nor is the investment ordinarily made at once for the entire time; on the contrary if the city grows as Denver did from 106,000 inhabitants in 1890, to double that number in 1910, the renewal of plant and extension of facilities for service and the like is measurably constant and continuous. Moreover, it is the common course as was the case here that the city retain the right upon its location of fire hydrants to demand of the Water Company the extension of mains and pipes into unserved districts or those newly populated, so that all within reason may receive the benefits. Much of the investment made under such conditions naturally remains unreturned at the end of the franchise period. It would be a grievous burden upon the inhabitants of a city if a water company exacted such rates as would yield a reasonable return and in addition thereto such part of the investment as, at the end of the franchise term, would reduce it to the value of an idle plant. No community would tolerate such charges, and in practice they are rarely if ever made. As was said by a hydraulic engineer selected by the city as an appraiser of the property in question: "To make a structure like Cheesman Lake 'pay out' in twenty years is unjust to the present generation of water takers." The lake referred to is a reservoir of a capacity of nearly twenty-six billion gallons which though owned by the subsidiary company is a part of the system of the Water Company. It is natural, therefore, to look for some treatment of the subject in the ordinance under consideration, and the parties point to sections 11, 12, 20 and 21. So far as need be quoted they are as follows:

"Sec. 11. At the expiration of the period of twenty years from and after the date of the passage and approval of the ordinance, in case the city shall then elect so to do, the said works may be purchased by the said city, and in case the parties cannot agree, after such election, upon the price to be paid by the city for the waterworks of the said company, its successors and assigns, then their fair cash value shall be determined by arbitration, by five disinterested persons, none of whom shall be residents of Denver, two of them to be chosen by the city, two by the company, and the fifth by the four first chosen. * * * and the decision of a majority of said board shall be final and binding upon both parties, and upon the payment, or tender of payment, by said city the said company shall convey to said city all of its property, real or personal, easements, rights and privileges, and thereafter all franchises, rights and privileges which have been at any time theretofore granted said company, its successors or assigns, and which it may then possess, shall cease and be at an end.

"Sec. 12. At the expiration of the said period of twenty years the said city may, at its election, renew the contract hereby made, by ordinance to that effect, for a like period of twenty years, but at a price for hydrant rental 10 per cent. less than mentioned in section 10 hereof, for the period remaining after the ten years after May 1st, 1891, and for successive periods of twenty

years at the price last aforesaid, as often and as long as the city may choose. * * * "

Section 20 provided that all the apparatus owned by the Water Company and composing its plant, then or thereafter placed in or upon the streets, alleys and other public places in the city shall be and remain the sole and absolute property of the Water Company, and it "shall forever be considered and entitled to be in possession thereof, except in case of purchase by said city under the terms of this ordinance, or some agreement between said city and said company, * * * when all rights of whatsoever nature of said company, * * * in and to the subject-matter hereof shall vest in said city."

"Sec. 21. While the consideration for the respective agreements of the city and the company are upon each side the several agreements of the other, all of the several grants, contracts and agreements in this ordinance contained are to be deemed independent agreements with the same force and effect as if each section of this ordinance was contained in a separate ordinance by itself."

[6] First, as to sections 11 and 12: For their operation they look to the expiration of the contract period 20 years in the future. Each of them purports to give the city a right of election, the former to purchase the waterworks at the agreed or appraised valuation and the latter to renew the contract with a reduced rate of hydrant rental. If the purpose was reasonably and fairly to conserve the rights of both parties and to encourage and assure the safety of a liberal investment by the Water Company essential to satisfactory service to the city and its inhabitants, they were related or connected alternatives, one or the other of which must be chosen. If section 11 stood alone in the ordinance it would seem clear that the city might do as it pleased, purchase or not purchase, whatever the circumstances. Though even in that case the provision for appraisal if the parties could not agree on the price would appear unnecessarily redundant, because the control of the situation would be almost entirely in the hands of the city. The Water Company, with its contract and franchise expired and no right to continue the use of the streets, would as a practical proposition be compelled to agree upon a price if the city was willing to buy. Without the vitality which comes from a franchise its property, designed for a special use, would have little value. Notwithstanding this, it was provided in section 11 that the election of the city to buy should precede the attempt of the parties to agree on the price, and that if they could not then so agree there should be an appraisal by third persons which should be "final and binding upon both parties." There is at least a suggestion in the provision for election and appraisal that the right or power of the city in that particular was intended to be qualified by the contract in some way so as to make it forego the natural advantages of its position at the expiration of the franchise. Why was the right of election to renew the contract affirmatively reserved by section 12 20 years in advance of its expiration unless intended as an alternative of a purchase? The section was inserted in the ordinance for some substantial reason. Standing alone, and disconnected from the preceding sec-

tion, it has little if any point when we consider the power the city already had under the law. As the law stood in 1890 the city could not then bind itself to renew, but the matter of renewal at the end of the franchise would be wholly within its control. There was no reason for making it the subject of contract with the Water Company, much less reserving a right of election with reference to it, unless it was intended to predicate some right of the Water Company upon it. But the parties went even further and stipulated that the renewal if made should carry with it a specified reduction in hydrant rental, and this fact adds to the significance of the presence of the section in the ordinance. The ordinary meaning of "elect" is to choose between alternatives, and having regard to the subject-matter of the contract and the relation of the parties it cannot well be said that there were two unrelated sets of alternatives of the city, namely, to purchase or not to purchase the waterworks under section 11, and, independently thereof, to renew or not to renew the franchise under section 12. The question is resolved more clearly and agreeably to reason by saying that each of the two sections contains a distinct proposition, one or the other of which must be adopted by the city, it having the choice. As already stated, the city could not in 1890 obligate itself to renew the contract in 1910, but having the power to own and operate a waterworks system of its own and to contract in advance for the purchase of that of the Water Company, it could lawfully have contracted to purchase if it did not renew. If the city having the power to renew did not exercise it, it should purchase. Section 20 of the ordinance does not throw much light on the question though it is in harmony with this conclusion.

[3] But section 21, upon which the city relies, provides that the several contracts and agreements in the ordinance shall be deemed independent with the same force and effect as if each section "was contained in a separate ordinance by itself," and the city contends that the above construction of sections 11 and 12 is therefore inadmissible. That section 21 was not intended to destroy all interrelation and dependency among the various parts of the ordinance is shown by its prefatory recital that the "consideration for the respective agreements of the city and the company are upon each side the several agreements of the other." There are other evidences to the same effect. For example, section 12, which provides for a renewal of the contract refers specifically to section 10 for the hydrant rentals that were to be reduced, and the concluding sentence of section 12 provides that the section is conditioned "upon the full performance by the city of the provisions of section 2 hereof," while section 2 in turn refers to section 1. Section 8 connects in necessary sense with section 7, and also refers to the subsequent parts of the ordinance, and so on. Moreover, there is a general relation and connection of context and subject-matter throughout the entire ordinance, and even if each section were a separate ordinance by itself they would still be read in pari materia as forming parts of a connected whole. Section 21 may reasonably be given due effect by construing it as in-

tended to preserve the contract as a whole against the failure of some part of it in point of law. In this connection it may be noted that certain provisions of section 5 as to water rates after the first five years were held by the Supreme Court of Colorado to be unenforceable. Denver v. Water Co., 41 Colo. 77, 91 Pac. 918.

This construction of the contract embodied in the ordinance of 1890 finds confirmation in the subsequent acts of the parties. In 1894 the city annexed the town of South Denver and thereby became the owner of a water system belonging to that municipality. Finding it was operating it at a loss an ordinance was adopted by the city December 15, 1894, and accepted by the Water Company, whereby the plant was leased to the company at an annual rental for the period ending April 10, 1910, which was the date of the expiration of the principal contract or franchise of 1890. This ordinance required the Water Company to put in new construction for the better equipment and efficiency of the leased property, and provided that at the termination of the lease the city, if it elected to do so, might purchase the new construction at the appraised value thereof. But it was also provided, as in the principal ordinance, that the election to purchase should precede the appraisal. If the city concluded not to purchase the new construction then the Water Company *was required to purchase what it had leased of the city, and in that event it was to receive a franchise upon the same terms as in the ordinance of 1890, the rates, restrictions, and limitations to be as under the franchise elsewhere in the city.* That ordinance is a complement of the one of 1890 to which it made express reference, and was designed to secure a uniform status for the entire city, either municipal ownership of the property of the Water Company or private ownership under an extended franchise. It shows quite clearly what the parties meant by sections 11 and 12 of the older ordinance contract.

Before proceeding to the question whether the obligation of the contract between the city and the Water Company has been impaired by a subsequent law of the state or under its authority, reference may appropriately be made to an appraisal of the property of the Water Company including that controlled by it, under an ordinance adopted October 2, 1907. Pursuant to the terms of that ordinance five appraisers were selected in the manner specified in section 11 of the ordinance of 1890, the city participating. They were disinterested hydraulic and civil engineers of national standing and reputation— one of Boston, Mass., one of Providence, R. I., two of New York City and one of St. Louis, Mo. After a thorough and exhaustive investigation covering about 18 months they announced a valuation of approximately $14,000,000. It was contemplated by the ordinance under which the appraisal was had that alternative propositions of purchase of the property or renewal of the franchise at rates to be fixed by the board of appraisers should be submitted to the qualified voters of the city, but it was not done for a reason for which neither the city nor the Water Company was responsible, and because of this neither of them waived any of its rights under the original ordinance

of 1890. The appraisal is referred to here chiefly for its light upon the value of the property involved. In this connection it should also be noted that the property, including that controlled as well as owned by the Water Company, stands as security for outstanding mortgage bonds aggregating $12,000,000, all of which, with $5,000,000 additional, it is alleged, was invested in the property upon the faith of the above construction of the contract of 1890 and with the knowledge and acquiescence of the city and its officers. It is also alleged that the contract of 1890 and its due observance constitutes in large measure the security for the bonds all of which are in the hands of innocent purchasers for value.

The Constitution of Colorado of 1902 established the municipal corporation which is termed the city, and provided for the election, by the electors thereof, of 21 taxpayers to constitute a charter convention to frame a charter for submission to the people for adoption. A charter was accordingly framed, and adopted in 1904. The Constitution also conferred upon the citizens of the city the exclusive power to amend the charter. In May, 1910, the month following the expiration of the Water Company's franchise of 1890, an amendment to the charter known as section 264a was adopted at an election. On July 6, 1910, ordinance No. 98 of that year's series was passed to carry out the terms of the charter amendment. It is contended by both the Trust Company and the Water Company that section 264a of the charter and the ordinance No. 98, both of which are laws within the meaning of the contract clause of the Constitution of the United States, impair the obligation of the contract between the company and the city, and are therefore void.

[4] Obviously the safety of the large investment in the property and the value of the security for the mortgage bonds depend in great degree upon the performance by the city of its part of the contract. If the charter amendment fairly construed means that the city shall neither elect to purchase the property of the Water Company at the value to be agreed on or else fixed by appraisers, nor renew the contract upon the terms specified in section 12 of the ordinance of 1890, it is void as impairing the obligation of a contract lawfully entered into, the duty to observe which still subsists. The charter amendment is in such case none the less void by reason of having its initiative in the electorate instead of in a representative legislative assembly. Such changes in the methods of making laws cannot impair or destroy the safeguards of the Constitution. The acts of the electors of a municipality in initiating and adopting local legislation are still laws of the state within the contract clause of the Constitution. While the state could not annul or render fruitless a lawfully executed contract nevertheless it might directly or indirectly determine the choice of the city between the contract alternatives, for the city as a subordinate governmental division is subject to its direction and control. For example, if a renewal of the contract alone were prohibited by a subsequent law or conditions for renewal prescribed which could not be complied with, an election to purchase would result from the exercise

of the superior power of the state. But if the law said the city should do neither it would be void.

[5] By section 264a a public utilities commission was created and given entire control over the subject of waterworks and water supply. It was invested with all the powers of the city "granted in the Constitution or named in the charter" with respect to constructing, purchasing, maintaining, and operating a water plant. There were also the following provisions:

"Except as in this section provided, the city and county shall never purchase or acquire or exercise any option, right, privilege or power of purchasing or acquiring any water plant or system from any person, persons or corporation except upon a vote of the qualified electors first had and obtained authorizing the same, and wherever in any ordinance or contract the former city of Denver was given the right, or the city and county now has the privilege or power to purchase or acquire any water system or plant or to extend any contract with reference thereto, the term 'city' used in any such ordinance or contract shall be taken and held to mean the qualified electors of the city and county and not otherwise."

"Upon a vote of the taxpaying electors authorizing the same, as hereinafter provided, the city and county of Denver shall and it does hereby authorize the creation of an indebtedness in the sum of eight million dollars to provide a municipal water plant or system and everything incidental or necessary thereto for supplying the city and county and its inhabitants with water for all uses and purposes, said indebtedness to be evidenced by its bonds of the par value of eight million dollars, in convenient denominations of not more than one thousand dollars each and bearing four and one-half per centum interest per annum of such date and in such form and maturing at such times as may be prescribed by said commission. The council shall pass such ordinances as said commission may deem necessary respecting the issuance of said bonds or to the full exercise of all the powers given it, in the form recommended by the commission, and without amendment, and the mayor shall sign the same."

"If the Denver Union Water Company shall place in escrow with the Continental Trust Company of Denver, on or before July 1, 1910, a good and sufficient deed of conveyance from said water company to the city and county of Denver for all the property of every description included and embraced in the appraisement made under ordinance 163, series of 1907, free and clear of all liens, incumbrances, claims and demands of every kind and character, accompanied by a valid surrender and release of any and all rights, claims and demands said company or any of its subsidiary, associated or affiliated companies may have against the city and county or against any of said property, with direction in writing to deliver the same to said commission in exchange for seven million dollars of said bonds at par, then the commission shall file its acceptance with said trust company and the same shall constitute a binding contract of purchase."

"In case the Denver Union Water Company shall fail or refuse to fully comply with all the foregoing provisions as to the things to be done and performed by it, then at the special election aforesaid in lieu of the foregoing question, there shall be submitted to the qualified taxpaying electors on the ballot the question of issuing eight million dollars in bonds to be sold or used to construct and put into operation a complete system of waterworks for supplying said city and county and the inhabitants thereof with water for all uses and purposes."

"Such bonds, or so much thereof as the commission may deem necessary, shall be sold or used by it to construct and put into operation a complete system of waterworks for supplying said city and county and its inhabitants with water for all uses and purposes, and said commission shall forthwith proceed to construct the same. The said commission shall, immediately upon its election, in case the Denver Union Water Company has not accepted the seven million dollars in bonds for its plant as aforesaid, proceed to make a careful investigation of the value of said plant for the uses and purposes of the city and county of Denver and its inhabitants, and also proceed to make

a careful estimate of the cost of constructing a complete new water system for the city and county of Denver and the inhabitants thereof and may submit an alternative bond proposition at said special election for the issuance of bonds in such sum as it may deem advisable for the acquisition or construction of a water plant or any part thereof by any of the ways within its powers herein mentioned."

The provision that if the Water Company did not accept the offer of $7,000,000 in bonds of the city the commission should make an investigation of the value of the company's property and might submit at the election a proposition for the issuance of bonds "for the acquisition or construction of a water plant or any part thereof by any of the ways within its powers herein specified" includes the employment of the power of eminent domain. The ordinance of 1910 follows the lines of the charter amendment and need not be more particularly noticed save to say that it calls an election and provides for the submission of the various propositions mentioned in the charter amendment.

The Water Company did not deposit a conveyance of its property and accept the offer of $7,000,000 therefor, and it appears from supplemental pleadings filed after the temporary injunctions were granted that the special election was held and the proposition to issue $8,000,000 of city bonds "to be sold or used to construct and put into operation a complete system of waterworks for supplying said city and county and inhabitants thereof with water for all uses and purposes" was carried, it having received a majority of the votes cast thereon. Section 264a and the supplemental ordinance constitute an attempted annulment of all obligation of the city under the ordinance of 1890; and the provisions for a bond issue for a municipal plant are an integral, inseparable part of the plan and purpose. The offer contained in the section of the charter of $7,000,000 for the property of the Water Company and the provision for the construction of a municipal plant in case the company refused to accept that sum constitute a distinct assertion that there will be no election to purchase according to the terms of section 11 of the ordinance of 1890. That section required that the city elect to purchase before the matter of price or value should be entered upon. If after the election was made the parties could not agree, there was then to be an appraisal by five disinterested nonresident persons which should "be final and binding upon both parties." These provisions are important and substantial, and the charter section is adverse to them. In effect that section declares that if the Water Company declines to accept the sum arbitrarily fixed the city shall then proceed to construct a plant of its own; and that means there shall be no purchase according to the contract.

There is also a clear conflict between the charter section and section 12 of the ordinance of 1890. An express contract was embodied in the ordinance that the Water Company should install hydrants upon its mains and supply them with water, and that the city should accept the service and pay the company therefor a specified annual compensation. A renewal of the contract would necessarily embrace a continuance of hydrant service and compensation; but the charter section has a different plan in view. By section 7 of the ordinance of 1890 the Water Company purchased from the city 493 hydrants which the

latter then owned and which were already installed, and the company agreed to replace them with hydrants of a different capacity. Within six months after the ordinance took effect the city was to designate the location of additional hydrants upon the water mains then in place, sufficient to bring the number to 1,000, and the Water Company was to install them within a year. By section 8 the Water Company agreed to supply with water the hydrants above mentioned and also those thereafter installed. By section 13 provision was made for the extension of the existing water mains and the equipment of the extensions with hydrants, also for the payment of rental by the city as in the other cases. Section 10 provides that the city shall pay the Water Company as follows:

"For the period of ten years from and after the 1st day of May, 1891, the sum of $35 per hydrant per annum for all hydrants then set and in operation, and for the remaining period until the right of purchase shall accrue, as mentioned in section 11 hereof, the sum of $25 per hydrant per annum for all hydrants then set and in operation."

It does not appear how many hydrants in addition to the thousand were installed upon the mains laid after the first year of the ordinance, nor how many were within the limits of South Denver or afterwards placed there, but it appears that the hydrant rentals were the principal if not the only compensation for the service rendered the city as a corporation. Such rentals are generally an important part of the income of a water company. Section 12 as already indicated provides for a renewal of "the contract hereby made, by ordinance to that effect, for a like period of twenty years but at a price for hydrant rental 10 per cent. less than that mentioned in section 10"; that is to say, 10 per cent. less than the rate which prevailed at the expiration of the contract, April 10, 1910. An extension of the contract as provided by section 12 would necessarily imply a continuation for 20 years of all of the terms of the ordinance except as otherwise specified, and it would include an obligation on the part of the company to furnish the hydrants with water, and on the part of the city to pay the reduced rental for the same. But section 264a of the charter contemplates the construction and operation of "a complete system of waterworks for supplying said city and county and its inhabitants with water for all uses and purposes." This means that the city shall not contract to accept from the company the hydrant service and pay it annually the large sum for hydrant rental.

It is well settled that a contract not to compete will not be implied from the mere grant of a franchise to build and operate, but that rule does not apply to the case at bar. Here, the contract was that when the 20-year period expired, if the city did not by ordinance grant the company a renewal embracing an obligation on its part to accept hydrant service as before and pay for the same at the reduced rate, it would take over the entire business by buying the property. It is no answer to say that the city may buy one complete system of waterworks and also build another, or may renew a contract entailing the annual payment of a large sum for hydrant service and also build a system of its own "for all uses and purposes." It is impossible to be-

lieve such an unnecessary waste was intended or was what the electors voted for when they adopted the charter amendment. By fair construction section 264a seeks to free the city from both of the alternatives, from all obligation to the Water Company, and if judged by their acts that is the view adopted by its officers including the members of the Public Utilities Commission. Though the time is past there has been neither renewal by ordinance nor purchase. True, the Trust Company says the city elected to purchase and the Water Company says it elected to renew, but the facts are stated upon which these claims are based and it does not appear to us that the city has done either. Its position is in opposition to both claims and it is proceeding to put into effect the provisions of the law upon which it relies. The case as presented in the pleadings and affidavits seems to be well within the settled principles which determine the impairment of the obligation of contracts by subsequent legislation and the right to protection therefrom by appeal to a court of equity. Though the Water Company is still operating its plant, serving the city and its inhabitants, and receiving compensation, it is without acknowledged, established right to do so, and even the temporary privilege is threatened. It is entitled to more than a status resting between assertion and denial, and is not required to wait until the injury has been fully inflicted. And the Trust Company has an equal standing to protect the rights of those it represents. Indeed the situation is one in which a determination of the rights of the parties is scarcely more important to those who have invoked the aid of the court than it is to the city which is about to incur a great indebtedness that might in part at least be avoided. Many other interesting questions were presented by counsel, but we have followed what seems to be a plainly marked road through the controversy.

Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes