## LEWIS v. BARBER ASPHALT PAVING CO. et al.

(District Court, S. D. New York. May 20, 1903.)

1. WHARVES—LIABILITY OF OWNER FOR INJURY TO VESSEL—UNSAFE CONDITION OF BOTTOM.

The owner of a wharf, used for its own purposes, which negligently allowed the bottom around it to become filled with obstructions, so that a vessel could not safely lie there unless special care was taken to prevent it from grounding at low tide, and which had a loaded lighter brought there and moored on Sunday, during the temporary absence of the master, assumed the duty of seeing that the vessel was so placed as to be safe, and is liable for its injury, resulting from the failure to breast it out into sufficiently deep water.

2. TOWAGE—TUG TAKING VESSEL WITHOUT A MASTER—LIABILITY FOR INJURY.

A tug which took the lighter from a safe anchorage without the knowledge of the master, and with no one on board, undertook to see that the duties of a master were properly discharged, and did not relieve herself from liability by delegating such duty to the wharf owner.

3. SAME—INJURY OF TOW—CONTRIBUTORY FAULT.

The master of a lighter which had been loaded on Saturday left her at the wharf that night, with no one on board, returning Sunday morning. He had no notice of any intention to move her on Sunday, which was not usual, but before his return she had been taken away by a tug at the instance of the cargo owner, and she was injured at the latter's wharf, through the negligent condition of the bottom, and the failure to give her proper care and attention. *Held*, that the owner was not chargeable with fault because of the absence of the master when the boat was moved.

In Admiralty. Suit to recover for sinking of lighter.

Wilcox & Green, for libellant.
Benedict & Benedict, for Barber Asphalt Co.
James J. Macklin, for the Thomas Quigley.

ADAMS, District Judge. This is an action brought by the libellant to recover from the respondent, The Barber Asphalt Paving Company, and from the tug Thomas Quigley, the damages incident to the sinking of a lighter named the Stamford, at a bulkhead, used as a wharf, of the Asphalt Company at Newark, New Jersey, on the 17th day of November, 1901. The libellant was part owner of the Stamford at the time and subsequently became the assignee of all other rights to recover losses arising from the sinking.

It appears that the Stamford was employed to transport a cargo of 175 tons of stone dust, contained in 3,500 bags, for the Asphalt Company from its place at the foot of Sixth Street, Hunter's Point, East River, to the bulkhead in Newark. The cargo was all taken on deck, in conformity with the custom in such cases, and the load-

ing was completed in the afternoon of Saturday, the 16th of November. In the evening of that day, the master of the Stamford, who had been aboard during the loading, left her temporarily for the purpose of getting some food and clothing, and did not return until about 7 o'clock the next morning. He was the only person employed on the boat and when he left there was no one in charge of her. He had not been notified that she would be moved Sunday, and expected that she would lie at loading wharf until Monday morning. About 6 o'clock in the morning of Sunday, the tug Quigley, which had been employed by a Mr. Harrington, who was supplying transportation for the Asphalt Company, went to the loading place and towed the boat thence to her destination at Newark, which she reached about 11 o'clock in the morning. Those on the Quigley made the lighter fast to a boat, which was lying at the bulkhead at Newark, told some men working on the boat that there was no captain on the lighter and left her there. The unloading of the boat, which was then in progress, was finished about noon and the men working on her, moved the lighter to the bulkhead and made her fast.

It was high water at Newark about 12:30 o'clock P. M. The rise and fall of the tide was about 7 feet. At low water, there were about 1½ to 2 feet of water close up to the bulkhead and the bottom then declined out towards the channel. The Stamford drew, as she was loaded, from 4 to 4½ feet of water. The bottom was not safe at the time for boats to lie upon, owing to the existence of irregularities in it, probably caused by barrels of asphalt getting overboard while being discharged and not immediately recovered, or from stone dropped in the water in small quantities and suffered to accumulate, but the bulkhead could be safely used by the vessels going there if vigilance were exercised to keep them breasted out, a sufficient distance, according to their respective draughts, so that they would remain afloat.

Being Sunday, the work at the Asphalt Company's place was not going on in the manner usual on week days and the superintendent in general charge was not there, but he left directions with an assistant for the conduct of the work and this man directed some laborers who were engaged in discharging the boat to which the Stamford was made fast, to take care of the latter in view of there being no master on board. These men were not familiar with the proper manner of caring for boats so that they would not suffer during the fall of the tide and instead of breasting this boat off to prevent her from grounding near the bulkhead and leaving the lines slack enough to permit her to fall with the tide and carefully watching her, they left one end without anything to breast it off and made the other end fast outside of a plank, ten or twelve feet long, with taut lines, and then left her without further attention. The result was that the lighter caught upon the ground at one end and, breaking her lines, slid into deeper water with the other end, which caused her to careen and when the tide came in again, she took in water through some small hatches in her deck and sank, probably before 8 o'clock.

There can be no doubt that the disaster was due to negligence and the question to be determined is, who shall be found to have

been guilty of it. The libellant charges it upon the tug and the Asphalt Company, the first because she took the boat away from a safe place without her master and without providing for her care after delivery at Newark, and the latter because it was responsible for the condition of the bottom of the river at its bulkhead, and also failed to take adequate measures to protect the boat from injury. Both the tug and the Asphalt Company claim that the accident was altogether due to the absence of the master of the boat, who should have remained on board or immediately have followed the boat to Newark, knowing where she was taken, and adopted the proper steps for her security.

The negligence of the Asphalt Company is very clearly made out. It was its duty to exercise vigilance to so maintain the bottom of the river near its wharf that vessels authorized to go there could do so without suffering injury from a defective condition. Penna. R. Co. v. Atha (D. C.) 22 Fed. 920; O'Rourke v. Peck (C. C.) 40 Fed. 907; Fahey v. The Mayor, etc. (D. C.) 49 Fed. 389, 61 Fed. 336, 9 C. C. A. 520. The bottom had not been dredged for a number of years and the place was unfit for use, in the absence of special care on the part of vessels to avoid grounding or injury from it. It is probable in this case that such care would have been exercised by a master on board and the accident avoided as similar ones had been by other vessels at the same place, but the lighter was delivered to and knowingly accepted by the Asphalt Company without a master and it assumed the performance of his duties.

The action of the Quigley in taking possession of the lighter under the circumstances is subject to severe criticism. She at least undertook to see that the duties of a master were properly discharged and I can not adopt her contention that she performed her full duty, and relieved herself from further responsibility, by delivering the lighter safely to the Asphalt Company. It was incumbent upon her to see that the boat did not suffer from the absence of the master and in delegating that duty to the Asphalt Company, she still remained liable if the duty were not performed.

It was not the libellant's fault that the master of the lighter was not on board when the tug took her in charge and no negligence can be imputed to him under the circumstances. The usual relations of the owner and the master were severed for the time by the action of the tug in taking possession of the boat in the absence of the master and the tug thereby assumed such care of the boat as belonged to the master, as well as that which it ordinarily owed. Moreover, in the absence of notice, the master could not be expected to know that the boat was to be moved on Sunday. It was an unusual proceeding and only done by the tug upon the special insistence of the Asphalt Company for its convenience and benefit.

In a careful fulfillment of his duties to his employer, the master should have proceeded at once to Newark and taken charge of the lighter but it does not appear that the result would have been changed by his doing so. I am not prepared to hold that the Asphalt Company and the tug can be relieved from any part of the obligations they assumed to the boat, because the master failed to be scrupulous-

ly exact in the performance of his duty, after the boat had been taken away from him.

Decree for the libellant against the Asphalt Company and the tug, with an order of reference.