CITY OF DENVER et al. v. MERCANTILE TRUST CO. OF NEW YORK.
MERCANTILE TRUST CO. OF NEW YORK v. CITY AND COUNTY
OF DENVER.

(Circuit Court of Appeals, Eighth Circuit.   November 11, 1912.)

Nos. 3,009, 3,010.

1. COURTS (§ 310*)—JURISDICTION OF FEDERAL COURTS—INDISPENSABLE PARTIES.

The trustee in a street railroad mortgage covering all of the property, franchises, and contract rights of the mortgagor may maintain a suit in equity in a federal court in its own right to enjoin the repeal of a franchise of the mortgagor which would seriously affect the value of its bonds, and under equity rule 39 (198 Fed. xxx, 115 C. C. A. xxx) is not required to join the mortgagor as a party, where it would defeat the jurisdiction of the court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 857;  Dec. Dig. § 310.*]

2. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

A federal court also has jurisdiction of such suit as one involving a constitutional question;  the franchise, if valid, constituting a contract which would be impaired by its repeal.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824;  Dec. Dig. § 282.*

Jurisdiction in cases involving federal questions, see notes to Bailey v. Mosher, 11 C. C. A. 308;  Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Mining Co., 35 C. C. A. 7;  Earnhart v. Switzler, 105 C. C. A. 262.]

3. MUNICIPAL CORPORATIONS (§ 71*)—LEGISLATIVE CONTROL—GRANT OF FRANCHISE IN STREETS.

Const. Colo. art. 15, § 11, which provides that "no street railroad shall be constructed within any city, town or incorporated village without the consent of the local authorities having the control of the street or highway proposed to be occupied by such street railroad," does not take away from the Legislature the power to prohibit municipalities from granting to such companies the right to use the streets except on such terms as it may by law prescribe, but merely requires the additional consent of the municipality, and gives it the right to impose additional terms and conditions.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 175;  Dec. Dig. § 71.*]

4. MUNICIPAL CORPORATIONS (§ 689*)—GRANT OF FRANCHISE TO STREET RAILROAD COMPANY—WANT OF POWER—ESTOPPEL BY RATIFICATION.

Where, at the time of the granting by a city of a franchise to an electric street railroad company, it was expressly authorized by its charter to make such grants only to horse or dummy roads, but after an amendment of its charter, expressly extending its power to electric lines, it passed other ordinances recognizing the validity of the grant, it thereby ratified the same, and, if the charter amendment did not operate as a curative act in itself, the city was estopped to deny its power to make the grant after the grantee had expended large sums in building and equipping its line in good faith.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1477, 1478, 1480;  Dec. Dig. § 689.*]

5. STREET RAILROADS (§ 24*)—MUNICIPAL GRANT OF FRANCHISE—VALIDITY.

Under a city charter authorizing the granting of the right to use the streets for street railroad purposes "upon the written consent of the own-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ers of the land representing more than one-half of the frontage of the street or so much thereof as is sought to be used for railroad purposes," the obtaining of such consent is not a prerequisite to the granting of the franchise, and an ordinance was valid which required the consent of the property owners to be obtained and filed before the grant became effective on any particular street.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 34–38, 43, 50–55, 69–76; Dec. Dig. § 24.*]

6. STREET RAILROADS (§ 28*)—CHANGE OF FORM—SUCCESSION TO PRE-EXISTING RIGHTS AND LIABILITIES.

Const. Colo. 1902, art. 20, which created the city and county of Denver from the city of Denver, with some added territory, to "succeed to all the rights and liabilities" of the city, etc., did not have the effect of terminating a franchise which had been previously granted to a street railroad company for an indefinite term, and under which the company had constructed its lines.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 39–42, 44, 45, 56, 61, 63–65; Dec. Dig. § 28.*]

7. STREET RAILROADS (§ 24*)—FRANCHISE—VALIDITY.

A grant by a city to a street railroad company of the right generally to construct its lines on any of the streets of the city as it may desire from time to time, without any limit as to time, is unreasonable and invalid in the absence of express legislative authority; but such provision does not render the grant void as to streets which are actually occupied or were at the time in contemplation of occupancy in the immediate future.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 34–38, 43, 50–55, 69–76; Dec. Dig. § 24.*]

8. EQUITY (§ 427*)—SCOPE OF RELIEF—MATTERS PRESENTED BY ANSWER.

A court of equity may grant relief as to matters occurring subsequent to the filing of the bill, without a supplemental bill, if within the scope of the original bill, when such subsequent matters are presented by defendant in the answer and proofs.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1001–1014; Dec. Dig. § 427.*]

9. STREET RAILROADS (§ 2*)—"CABLE RAILROAD."

The term "cable railroad," as used in Denver City Charter (Laws Col. 1885, p. 85) art. II, § 20, par. 46, implies a street railroad.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 2–4; Dec. Dig. § 2.*]

Carland, Circuit Judge, dissenting.

Appeals from the Circuit Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit in equity by the Mercantile Trust Company of New York against the City of Denver and others and the City and County of Denver. Decree for complainant, and both parties appeal. Modified and affirmed.

For opinion below, see 161 Fed. 769.

W. H. Bryant, of Denver, Colo. (Thomas R. Woodrow, J. A. Marsh, Paul Knowles, William A. Bryans, W. R. Kennedy, H. A. Lindsley, F. W. Sanborn, and N. Walter Dixon, all of Denver, Colo., on the brief), for City and County of Denver.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Gerald Hughes, of Denver, Colo. (Clayton C. Dorsey and Howard S. Robertson, both of Denver, Colo., on the brief), for Mercantile Trust Co. of New York.

Before SANBORN and CARLAND, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge.  In 1885 the city of Denver was a municipal corporation, one of the subdivisions of the state of Colorado.  On February 5, 1885, the Denver Electric & Cable Railway Company incorporated under the general laws of the state of Colorado. The objects for which it was formed were stated in the articles of incorporation as follows:

"To construct, equip, maintain, operate and own electric and cable railways in the state of Colorado; to deal in patent and other rights therefor, and to do any and all things necessary to carry out such objects."

The life of the corporation was stated to be 50 years from that date.

On February 5, 1885, the city council of the city of Denver passed an ordinance known and designated as "No. 3, 1885."  Said ordinance contained 10 sections.

The first section was in the following words:

"That the right of way be, and the same is hereby granted to the Denver Electric & Cable Railway Company, its successors and assigns, to build, operate, and maintain a single or double track railway, with switches, turn-outs, side tracks, and other appliances necessary for the operation of the same, in, along and across the streets of the city of Denver, said railway to be operated by power transmitted by use of electricity or by cable."

The second section related to the grade of the tracks.

The third required the company to execute and file a bond to hold the city harmless from all damages it might sustain by reason of the location, construction, or operation of its railway within the city.

The fourth related to the gauge of track and required certain paving or planking to be done.

The fifth section required that, before entering upon the occupancy of any street, the company should "obtain and file with the city clerk the written permission for such occupancy of the owners of more than one-half of the frontage upon so much of said street as said company proposes to occupy."

The sixth section related to the rate of fare to be charged.

The seventh related to the time within which the company should begin the construction of said railroad, and requiring two miles of railroad to be in operation within two years.

The eighth related to the maximum speed at which the cars should be moved.

The ninth section was as follows:

"That the city council reserve the right to pass any ordinance with reference to the operating of said railway which the comfort of the inhabitants of this city or the safety of the passengers of the said railway may require, reserving, also, all legislative and police powers and functions with respect to

the streets that may be used and occupied by said company that it had before the passage of this ordinance."

The tenth section related to the construction and maintenance of culverts.

This ordinance was approved by the mayor the following day, February 6, 1885. Thereafter the Railway Company filed the bond required by the ordinance and entered upon the construction of its road upon some of the streets of the city. For that purpose, it filed in the office of the city clerk on various dates between April 28 and July 10, 1885, the written consent of the owners of more than one-half of the frontage for the occupancy by its road of portions of certain of the streets in the city.

Several subsequent ordinances were passed amendatory of said Ordinance No. 3. The Denver Electric & Cable Company subsequently became merged into the Denver Tramway Company, the Denver Tramway Company succeeding to all the rights of the Denver Electric & Cable Company. The Denver Tramway Company was subsequently merged into the Denver Consolidated Tramway Company, which succeeded to all the rights of the Denver Tramway Company, and the Denver Consolidated Tramway Company subsequently was consolidated into the Denver City Tramway Company, which latter company now owns and operates the street railway system in said city. On July 28, 1888, the Denver Tramway Company executed its mortgage or trust deed to the Mercantile Trust Company upon all of its railway property rights and franchises within the city of Denver to secure bonds in the sum of $1,000,000. On January 1, 1890, it executed and delivered a second mortgage to the Mercantile Trust Company, covering the same property, to secure bonds in the sum of $2,-000,000. On October 11, 1893, the Denver Consolidated Tramway Company executed and delivered a mortgage or trust deed to said Mercantile Trust Company upon all of its railway, franchise rights, etc., in the city of Denver, to secure bonds in the sum of $4,000,000. On the 4th day of May, 1899, an ordinance was introduced in the board of aldermen of the city of Denver, repealing said Ordinance No. 3 of 1885, and on the 9th day of May the same was passed as Ordinance No. 65, and thereupon went for consideration and passage or rejection to the board of supervisors of said city, and was by the board of supervisors referred to the appropriate committee for consideration and a report thereon. While said ordinance was pending before said board of supervisors, and before any action thereon, excepting to refer the same to a committee, and while the same was being considered by the committee, complainant, to wit, on the 24th day of May, 1899, filed a bill in the Circuit Court of the United States for the District of Colorado, alleging the passage of Ordinance No. 3 of 1885, its acceptance by the Denver Electric & Cable Railway Company, the construction of a system of railways thereunder, the expenditure of several million dollars in the construction and operation of such railways, the transfer of all rights acquired by the Denver Electric & Cable Railway Company under said ordinance to the Denver Tramway Company, by the Denver Tramway Company to the Denver Consolidated Tramway

Company, and by the Denver Consolidated Tramway Company to the Denver City Tramway Company, the execution of the mortgages from the Denver Tramway Company and the Denver Consolidated Tramway Company to the complainant; alleged that in December, 1889, the officers and employés of the Railway Company were interfered with and prevented from constructing additional portions of its line of railway within the city by certain officers and employés of the city; that the Railway Company, to protect its rights claimed under said Ordinance No. 3, instituted a suit in the district court of the county to enjoin such officers from interfering with its construction of the work; that the district court refused an injunction, holding that said Ordinance No. 3 was void; that thereupon the Railway Company appealed to the Supreme Court of the state, where a final judgment was entered, reversing the judgment of the district court, the Supreme Court holding that, whether said Ordinance No. 3 was valid or not, it was unnecessary to determine in that action; that, inasmuch as the Railway Company had acted in pursuance thereof, had constructed and operated an extensive system of railway upon the streets of the city, which had been acquiesced in by the city, and its inhabitants, the officials of the city were not authorized to determine for themselves that the ordinance was invalid, and obstruct the Railway Company in its operations, without a declaration from the legislative body of the city, disaffirming said ordinance. No further action was taken on behalf of the city contesting or challenging the rights of the Railway Company under said Ordinance No. 3 until the introduction of the repealing Ordinance No. 65.

Complainant in its bill further alleged that the validity of Ordinance No. 3, and the right of the Railway Company to occupy the streets of the city under its provisions, was publicly and extensively discussed through the newspapers and by the public, to such an extent that if repealing Ordinance No. 65 should be passed and adopted, notwithstanding its invalidity, it would impair the value of the securities of the Railway Company which had been issued to complainant as trustee; that the action of the board of aldermen and board of supervisors in passing such repealing ordinance would be void as impairing the obligation of a contract, and prayed that the board of aldermen and board of supervisors be enjoined from the passage of such repealing ordinance, or passing any ordinance, or taking any action, to impair the obligation of the contract between the city and the railway company embraced in said Ordinance No. 3 of 1885, and for general equitable relief. The Circuit Court granted a temporary order of injunction, from which an appeal was taken to this court, and the judgment of the Circuit Court affirmed (102 Fed. 1001, 41 C. C. A. 676), this court not passing upon the question of the validity of Ordinance No. 3, or the proposed repealing Ordinance No. 65, but simply deciding that the discretion of the Circuit Court, in granting the temporary injunction, was not improperly exercised under the particular state of facts. The respondents answered the bill, admitting many of the allegations, but insisted that Ordinance No. 3 of 1885 was invalid for various stated reasons. At the hearing in the trial court defend-

ants, by leave of court, filed a supplemental answer, among other things setting up the passage and approval July 15, 1899, of an ordinance, No. 76, repealing Ordinance No. 3 of 1885, and certain subsequent ordinances amendatory thereof, said repealing ordinance, however, providing:

"That this ordinance shall not apply to or in any manner affect any rights which the Denver Electric & Cable Railway Company, its successors and assigns, may now have in relation to any electric street railway lines at present. constructed and now in actual operation in said city of Denver."

It further set up the adoption of an amendment to the Constitution of the state, being article 20, by which the city of Denver, with some adjacent outlying territory, became incorporated as the city and county of Denver, and duly authorized to adopt its own charter; that on the 27th day of April, 1906, Ordinance No. 74 was passed, approved, and published, submitted to the electors of said city and county for approval at an election held on the 15th day of May, 1906, and the same was at such election duly adopted. In the preamble to said ordinance it was recited, among other things:

"Whereas, the Denver City Tramway Company, under and by virtue of certain ordinances, franchises, grants, and rights of way, now maintains and operates a system of street railways over, along and across certain streets, alleys, viaducts, bridges, public ways and places in the now city and county of Denver, hereinafter described and enumerated; and

"Whereas, the needs of the city and county of Denver and its inhabitants require and will, in the future require, certain extensions, betterments, new construction, and improvements of said street railway system, and all of which is desired by the city and county of Denver and its duly qualified taxpaying electors to be undertaken by the Denver City Tramway Company, wholly at the expense of the Denver City Tramway Company, and without any unnecessary delay; and

"Whereas, The Denver City Tramway Company is willing to undertake such extensions, betterments, new construction and improvements on the terms hereinafter set forth; and   *   *   *

"Whereas, a contention and litigation has arisen concerning the validity, extent, scope and duration of the ordinances, franchises, grants, rights of way and privileges claimed by the Denver City Tramway Company, and a portion of which litigation is now pending and unsettled; and

"Whereas, it is desired that such extensions, improvements, new construction and expenditures shall be undertaken and made forthwith without awaiting the outcome of the various contentions and litigation between the Denver City Tramway Company and the city and county of Denver, concerning the ordinances, franchises, grants, rights of way and privileges belonging to the Denver City Tramway Company, and the scope, extent and duration thereof.   *   *   *"

Said ordinance granted the right of way to the Denver City Tramway Company to construct, operate, and maintain its railway upon a large number of streets therein enumerated, comprising the streets already occupied by the Tramway Company, and other streets, for a period of 20 years. The eleventh section of the ordinance, however, was as follows:

"Neither this franchise or grant or any provision herein, or the proposal thereof, shall be a waiver of any right, claim, grant, license, or franchise or right of way belonging to or claimed to belong to the Denver City Tramway Company, or any of its assignor, predecessor or consolidating companies,

nor shall this franchise in any manner be considered as a waiver in any way of any litigation or contention, by either the city and county of Denver or the Denver City Tramway Company or any of its predecessor or constituent companies to the prejudice of either party as to the validity, scope or duration of any franchise, grant or right of way, but the rights of both parties and their positions and contentions in any and all litigation, and concerning such ordinances, franchises, grants, licenses, and rights of way, shall remain entirely unaffected by this ordinance."

The trial court, upon the issues joined, found the facts and entered its decree as follows:

"That since the enactment and passage of Ordinance No. 3 of the series of 1885 of the city of Denver and down to the present time all the terms, provisions, and conditions thereof prescribed to be kept by the Denver Electric & Cable Railway Company, its successors or assigns, have been fully kept, performed, and observed by the said company, the Denver City Tramway Company, and its grantor and predecessor companies, and that large sums of money for permanent improvements and for establishing an extensive and connected system of street car lines has been expended, and that such expenditures have been made and such system of street car lines built and operated in good faith and in reliance upon said Ordinance No. 3 of the series of 1885 of the city of Denver, and that bonds have been issued and sold by the companies, successors in interest to the Denver Electric & Cable Railway Company in reliance upon the validity of said ordinance, and that said bonds were secured by mortgage, upon the property of each of said companies and the rights and estates thereof, including the contract and franchise evidenced by Ordinance No. 3 of the series of 1885 of the city of Denver. That at the time of the introduction and passage and enactment of Ordinance No. 76 of the series of 1899 there existed no cause under the terms of Ordinance No. 3 of the series of 1885 of the city of Denver for the repeal thereof or of any portion thereof, and that said Ordinance No. 76 of the series of 1899 was enacted without authority on the part of the defendants so to do and at a time when Ordinance No. 3 of the series of 1885 was in full force and effect, and had, as to all its terms and provisions been kept. That the acts, claims, threats, and performances of the defendants, including the introduction and threat to enact as an ordinance of the city of Denver, Aldermanic Bill No. 65 of the series of 1899, on May 4, 1899, and the introduction and enactment of Ordinance No. 76 of the series of 1899, and the assertion by the defendant and their predecessors and successors in office of a right to repeal and invalidate Ordinance No. 3 of the series of 1885 of the city of Denver, constituted and does constitute a cloud upon the title of the complainant, the Denver City Tramway Company, and of its grantor and predecessor companies, from which the complainant is entitled in equity to be relieved by a proper decree of this court.

"Therefore the court doth order, adjudge, and decree: That Ordinance No. 3 of the series of 1885 of the city of Denver is a valid and binding contract between the city of Denver, the city and county of Denver, and the complainant the Denver City Tramway Company, its successors and assigns, of a duration of at least 50 years from the date of its passage and enactment, and that it is unnecessary in this suit and now for the court to determine the duration of said ordinance, if any, beyond said period of 50 years, or as to whether or not it is unlimited in time, such questions not being determined by this suit or decree; that repealing Ordinance No. 76 of the series of 1899 was at and ever since the time of its passage, and is now, illegal, unauthorized, and invalid and of no force or effect whatsoever, and is for naught held, and the defendants herein, the city and county of Denver, the supervisors and aldermen thereof, together with all persons, attorneys, and agents of the city and county of Denver, are hereby forever enjoined and restrained from maintaining or asserting the validity of Ordinance No. 76 of the series of 1899, or from asserting any rights thereunder, or any claims or contentions thereunder against the complainant herein, the Denver City Tramway Company, its successors or assigns."

From the decree so entered, the respondents have appealed to this court, such appeal being No. 3,009, and complainant has filed a cross-appeal, No. 3,010, asserting that the court below erred in not finding that the Denver City Tramway Company had a perpetual franchise to occupy the streets of the city. The questions discussed will be in No. 3,009. No question was raised in the court below nor in the briefs first filed in this court as to the jurisdiction of the trial court. A supplemental brief, however, has been filed, challenging that jurisdiction. As the question of jurisdiction may be raised at any stage of the case, we first proceed to a consideration of that subject.

[1] It is claimed by appellants that jurisdiction is based entirely upon diversity of citizenship; that the Denver City Tramway Company, the present owner, and in possession of the street railway was an indispensable party to the action, and if made a party, its interests being entirely with that of complainant and diverse to that of respondents, it should be classed as a complainant, and hence diversity of citizenship defeated. The Denver City Tramway Company was not, however, made a party to the action, and we think it was not an indispensable party. Complainant was the trustee in the mortgage or trust deed given to secure bonds issued by the street railway company. Its mortgages covered, not only the physical properties of the Tramway Company, but its franchise and contract rights, and it certainly had a standing in a court of equity to protect such rights from any unlawful invasion. Old Colony Trust Co. v. City of Wichita (C. C.) 123 Fed. 162; affirmed, 132 Fed. 641, 66 C. C. A. 19; Clapp v. City of Spokane (C. C.) 53 Fed. 515; Knickerbocker Trust Co. v. City of Kalamazoo (C. C.) 182 Fed. 865; City & County of Denver v. New York Trust Co., 187 Fed. 890–902, 110 C. C. A. 24.

Again, equity rule No. 39 (198 Fed. xxix, 115 C. C. A. xxix), which reads as follows:

"In all cases where it shall appear to the court that persons who might otherwise be deemed necessary or proper parties to a suit cannot be made parties by reason of their being out of the jurisdiction of the court, or incapable otherwise of being made parties, or because their joinder would oust the jurisdiction of the court as to the parties before the court, the court may, in their discretion, proceed in the cause without making such persons parties, and in such case the decree shall be without prejudice to the rights of the absent parties"

—expressly authorized the maintenance of the suit without making the Tramway Company a party. Sioux City Terminal R. & Warehouse Co. v. Trust Co. of N. A., 82 Fed. 124, 27 C. C. A. 73; Hunter v. Robbins (C. C.) 117 Fed. 920. If it is true, as claimed by the respondents, that the joinder of the Tramway Company would defeat the jurisdiction of the court, then, under rule 39, complainant was authorized to omit making it a party. So that, for the reason that complainant, as trustee of the mortgages mentioned, could maintain the action in its own right (the Tramway Company not being an indispensable party, although it would have been a proper party), as well as for the reason stated in equity rule No. 39, we think the court had jurisdiction upon the ground of diversity of citizenship.

[2] We also think that if, as claimed by complainant, and alleged in the bill, Ordinance No. 3 of 1885, constituted a contract between the city and the Denver Electric & Cable Railway Company and its assigns, such contract right was covered by complainant's mortgage, and, as it was sought to enjoin the city from impairing the obligation of such contract, the bill presented a case of jurisdiction based upon the existence of a federal question. It is also insisted that the court, as a court of equity, did not have jurisdiction of the case. This has been discussed on behalf of the city largely upon the ground that, under the pleadings and evidence, a case has not been made which entitles complainant to equitable relief. That, however, does not affect the question of the jurisdiction of the court, as a court of equity, to determine such fact.

The bill being framed upon the theory that the city was threatening and attempting to impair a valid contract right, and the object of the bill being to restrain such unlawful attempt, it clearly presented a case of equitable jurisdiction, although the court might, in the exercise of that jurisdiction, find and determine that the ultimate facts would not justify granting to complainant any relief. Jurisdiction to inquire into and determine is an entirely different proposition from the ultimate determination in the exercise of such jurisdiction, whether parties are entitled to equitable relief. Venner v. Great Northern Ry. Co., 209 U. S. 24, 28 Sup. Ct. 328, 52 L. Ed. 666; Riverside & A. Ry. Co. v. City of Riverside (C. C.) 118 Fed. 736; City Ry. Co. v. Citizens' St. Ry. Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114; Ill. Central Ry. Co. v. Chicago, 176 U. S. 646–656, 20 Sup. Ct. 509, 44 L. Ed. 622; Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753.

The court then having full jurisdiction, we proceed to a consideration of the merits of the case, which involves, first, the validity of Ordinance No. 3 of 1885.

[3] It is said upon the part of the city that the ordinance is invalid, for the reason that it was not within the authority possessed by the city under its charter, for various reasons which will hereafter be considered. In answer to this, however, it is claimed, on behalf of the complainant, that the power of the city to pass the ordinance in question was not derived from the charter but from section 11 of article 15 of the Constitution, which is as follows:

"No street railroad shall be constructed within any city, town or incorporated village, without the consent of the local authorities having the control of the street or highway proposed to be occupied by such street railroad."

This provision of the Constitution, it is claimed on the part of the complainant, was a direct grant of authority to municipalities, and withheld from the Legislature any authority or control over street railroads within any city, town, or incorporated village. We do not so interpret this provision. It is to be borne in mind that, in the absence of constitutional restraint, the Legislature of the state could have granted directly the authority to construct, maintain, and operate street railroads within cities, towns, or incorporated villages, upon such

terms as the Legislature might impose, without reference to the wish or consent of the inhabitants of such city, town, or incorporated village. This section of the Constitution was intended simply as a restraint upon the power of the Legislature in this respect, that the Legislature could not directly grant authority for the construction, maintenance, or operation of a street railroad in such municipalities, without the consent of the municipality. It did not, however, withhold from the Legislature the power to prohibit municipalities from granting to street railroads authority to occupy the public streets of the municipality except on terms which the Legislature should see fit to impose, but it gave to municipalities authority to impose other and additional terms from those prescribed by the Legislature, or to withhold consent entirely.

For a construction of similar constitutional provisions, our attention has been called to the cases of Birmingham & Pratt Mines St. Ry. Co. v. Birmingham St. Ry. Co., 79 Ala. 465, 58 Am. Rep. 615, and City of Allegheny v. Millville E. & S. St. Ry. Co., 159 Pa. 411, 28 Atl. 202.

In the former case, the court said:

"The equity of the complainant's bill in this case depends, in our judgment, upon a single inquiry, and that is whether the municipal authorities of the city of Birmingham were invested by law with the power to make to the appellee, the Birmingham Street Railway Company, an irrevocable grant of the exclusive privilege to construct and operate a street railway over and through certain streets and avenues of that city. * * * The power to make this exclusive grant, which though not strictly a monopoly is certainly in the nature of one, must be derived either from some clause in the charter of the city, from the laws of the state under which the appellee railway company was organized, or from the Constitution of Alabama, which is the organic law of the state.

"The only section of the present Constitution of 1875, bearing on the question of street railways is section 24 of article 14, which provides that 'no street passenger railway shall be constructed within the limits of any city or town without the consent of its local authorities.' This is peremptory and not permissive in its nature, and confers no franchise or right of any kind upon any person or corporation much less one of an exclusive character. This is not denied, and is too obvious for argument."

The court then discussed the charter powers of the city and the applicable state laws to determine the authority of the city of Birmingham in respect to the matter involved in the suit.

In the second case the question involved was whether the city of Allegheny could require as a condition upon which a street railway could occupy any of the streets of the city, that it should perform certain acts and make certain payments to the city. The court said:

"By section 9, art. 17, of the Constitution 'no street passenger railway shall be constructed within the limits of any city, borough, or township, without the consent of its local authorities.' * * * The public history of the time, of which the court may take judicial notice, shows that one of the prime objects of the people in calling a constitutional convention was to do with special legislation which interfered with local affairs or granted privileges to particular bodies and withheld them from others, with a semblance of partiality rather than of equal favor to all. That object was carried out in the Constitution adopted so broadly that it is a matter of grave doubt whether the object itself has not sometimes been defeated by tying the hands of

the Legislature too closely to permit it to help special localities with special needs by legislation which they really want and ought to have. But, however that may be in other matters, the provision now under consideration, as already said, is peremptory and without express limitations of any kind. It is a gift directly from the Constitution to the local bodies, and needs no help or permits any interference from the Legislature. If any limitations are to be implied by the courts, the implication must arise from clear necessity as absolute, as peremptory, as unavoidable as the constitutional mandate itself. The burden is therefore upon the party affirming that the exercise of the local authority is not valid. * * * It is conceded that the local authorities may impose some conditions such as those relative to the police power. But where is the grant to any other body to supervise and limit the conditions or say what they shall be? The Legislature clearly cannot do it. The very purpose of the provision was to put an end to the Legislature's interference. Nor can the courts trespass upon the discretion given absolutely by the Constitution to the local bodies."

Had the opinion stopped here, it might well be claimed that it was an authority to the effect that the constitutional provision was an affirmative grant to the municipality, and that the Legislature of the state could exercise no restraining powers in respect thereof. But the court further said:

"It is not illegal or unreasonable that the public, or the city which represents it, should have a consideration for the privilege which it confers. If it were a right of passage over private property, there would be no question about it, and the right could not be got in any other way. We see no reason why the public interests should not be promoted by requiring special privileges in the public property to be paid for in some way. It is a matter of general knowledge that the street railways in the city of Baltimore pay part of the fare of every passenger into the city for the development and care of Druid Hill Park, and we learn from the report of People v. Barnard, 110 N. Y. 548, 18 N. E. 354, that by an act of 1886 (Laws 1886, c. 65 as amended by Laws 1886, c. 642) in New York municipalities are obliged to put up their consent to the construction of street railways within their limits at auction, and award it to 'the bidder who will agree to give the largest percentage per annum of the gross receipts.' The constitutional provision in New York is closely similar to our own. Whether the legislation could prescribe that the consent of the local authorities in this state could only be given on such condition we express no opinion about, as it is not before us. But it would certainly be no cause of complaint if our own legislators, general or local, should look as closely after the pecuniary interests of the public involved in the grant of franchises."

So it will be observed that the question as to whether or not the constitutional provision was such a grant of power to the municipality that the Legislature in granting to the city a charter could not impose some restrictions upon the exercise by the municipality of the constitutional grant was not before the court, and it was a question which the court expressly said it did not pass upon. The only question before the court, and the one passed upon, was the power of the municipality to prescribe conditions of its own other and different from those, if any, imposed by the Legislature. See, also, 3 Dillon on Municipal Corporations (5th Ed.) § 1228; Missouri River Tel. Co. v. City of Mitchell, 22 S. D. 191, 116 N. W. 67.

[4] The city claims that Ordinance No. 3 of 1885 is invalid, first, for the reason that, under its charter, it was limited to granting the use of its streets for railways to such as operated its cars by horse power

or dummy engines; second, that the city council was without jurisdiction to pass the ordinance without the consent being first obtained of a majority of the property owners upon the streets to be occupied by the railway company; third, that as the ordinance did not designate the streets upon which the Denver Electric & Cable Railway Company might construct and operate its road, but was a blanket ordinance, covering all the streets, leaving it to the Railway Company to select from time to time in the future, as it should see fit, the streets which it should occupy, it was an unlawful delegation of authority to the railway company in that respect; fourth, that, as the ordinance did not contain any limitation of time, the grant was perpetual, and the city had no authority to grant a perpetual franchise.

The charter of the city of Denver, as it existed at the time of the passage of Ordinance No. 3 of 1885, contained the following provisions:

"41. To permit and regulate the running of horse railway cars or cars propelled by dummy engines, the laying down tracks for the same, the transportation of passengers thereon, and the form of rail to be used, upon the written consent of the owners of the land, representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes."

"43. To regulate and prohibit the use of locomotive engines, and require railroad cars to be propelled by other power than that of steam, to direct and control the location of the railroad tracks. * * *" Session Laws of 1883, pp. 64, 65.

The question is then presented: Was the power of the city of Denver by its charter limited to the granting of authority for the use of the streets of the city by railroads to those in which the motive power was horse or dummy engine? In other words, was the term "horse and dummy engine" used as a limitation upon the motive power to be used, or was it merely an illustration of power other than steam. Upon this point the authorities are not in harmony, and we think it unnecessary to decide the question, for, whether or not the city, under its charter, had authority to grant the right to operate cars upon the streets propelled by electricity, we think Ordinance No. 3, in this respect, was subsequently ratified. On March 16, 1885, 10 days after the approval of Ordinance No. 3, the Legislature of the state granted a new charter to the city, which contained the following provisions:

"44. To permit and regulate the running of horse railway cars or cars propelled by dummy engines, the laying down tracks for the same, the transportation of passengers thereon, and the form of rail to be used."

"46. To regulate the use of locomotive engines, to direct and control the location of cable and other railroad tracks." * * * Session Laws 1885, pp. 74–85.

[9] It is to be observed that section 46, above quoted, was an enlargement upon the powers of the city, in that it gave the power to direct and control the location of cable and other railroad tracks. This of necessity empowered the city to authorize the construction and operation of cable and other railroad tracks within the city, and may be said to be a construction of section 44, that the term "horse railway cars or cars propelled by dummy engines" was merely used as illus-

trative of the power with which the cars upon the street should be operated. The term "cable railroad" clearly, and we think necessarily, implied a street railroad, as cable railroads were known and in use in the operation of railroads in the streets of municipalities, but not in general use as motive power outside of the streets of municipalities. Be that as it may, however, in 1889, the charter of the city was again modified, section 44 reading:

"To permit and regulate the running of horse railway cars or cars propelled by dummy engines, cable or electricity, the laying down tracks for the same, the transportation of passengers thereon, and the form and kind of rail to be used. * * *" Session Laws of 1889, p. 124.

Subsequent to the passage of the act of 1885 and the act of 1889, the city council passed various ordinances expressly ratifying Ordinance No. 3 of 1885, and such was substantially the holding of the Supreme Court of the state, in Denver Tramway Co. v. Londoner, 20 Colo. 150–153, 37 Pac. 723. That was an action brought by the Denver Tramway Company to enjoin the mayor and chief of police of the city from interfering with the company in its work of constructing its electric lines. The court said:

"The actual question now presented for determination is simply this: Were the employés of the plaintiff company, in prosecuting the work of constructing the electric railway lines of said company through the streets of the city of Denver in December, 1889, guilty of such misconduct as to render them liable to be interfered with and treated as trespassers by the executive officers of the city? The determination of this question involves the consideration of the laws of the state, and also the ordinances of said city as they existed prior to and at that date. The Constitution of Colorado has always contained the following provision: [Quoting section 11, art. 15, supra.] The charter of the city of Denver as amended in 1883 provided, among other things, that the city council should have power by ordinance as follows, to wit: [Quoting sections 41, 43, Session Laws 1883, supra.] While the foregoing charter provision was in force the city of Denver passed an ordinance containing the following: [Quoting section 1, of Ordinance No. 3, 1885, supra.] The charter of the city of Denver as amended in 1885 among other things authorized the city: 'To regulate the use of locomotive engines, to direct and control the location of cable and other railroad tracks.' Article 2, § 20, Session Laws 1885, p. 85. Under the charter thus amended, the city council passed an ordinance expressly recognizing Ordinance No. 3, of February 6, 1885, as valid, and providing for its enjoyment to a certain extent by the plaintiff company. See Ordinances 28 and 29, adopted May 2, and 3, 1888. The charter of the city, as amended in March, 1889, authorized the city council by ordinance: [Quoting section 44, Session Laws 1889, supra.] Subsequent to the passage of this amendment, the city council passed an ordinance (No. 27, adopted May 13, 1889) recognizing rights of way theretofore granted for the use and occupation of the streets and avenues of the city by street railway cars propelled by electricity as well as by horse power, dummy engines, cable and steam. Such ordinance provided for the issuance of permits by the city engineer to any company or corporation constructing such railways to excavate the streets for that purpose, and also contained specific regulations concerning the manner in which the streets and avenues should be used and occupied for such purposes. * * *

"It is true the charter of 1883 did not specifically authorize the city of Denver to permit the operation of street railways by electricity. But, as we have seen, the various amendments to the charter of the city of Denver bear ample proof of the policy of our legislation in the matter of the location and operation of street railways. As by the progress of science, discovery, and

invention new kinds of motive power have been found useful for propelling street railway cars, so the charter has been amended expressly authorizing the use of cable power in 1885, and electric power in 1889 for that purpose, in addition to horse power and dummy engines theretofore authorized to be used. It is true that in advance of specific legislative authority, but nevertheless in pursuance of the general legislative policy of the state, the city council of Denver did pass an ordinance authorizing the company (of which the plaintiff company is the successor) to construct and operate street railway cars by electricity. It is also true that by a charter provision subsequently enacted by the state Legislature the city was expressly authorized to permit the running of railway cars by electricity; and this charter provision was shortly followed by a city ordinance expressly recognizing such grants of authority as had theretofore been given to use and occupy the streets of the city for the purpose of constructing and operating railway cars by electricity, as well as by other kinds of motive power.

"Conceding that the city was without authority to adopt Ordinance No. 3 on February 6, 1885, it is nevertheless urged with much force and reason that the charter amendments of 1885 and 1889 as above stated and the ordinances adopted thereunder are to be regarded as curative statutes, thus legalizing the subsequent use of electric power by the plaintiff company. A standard author says: 'The rule in regard to curative statutes is that if the thing omitted or failed to be done, and which constitutes the defect sought to be removed or made harmless, is something which the Legislature might have dispensed with by a previous statute, it may do so by a subsequent one. If the irregularity consists in doing some act, or doing it in the mode which the Legislature might have made immaterial by a prior law, it may do so by a subsequent one. On this principle the Legislature may validate contracts made ultra vires by municipal corporations. It may thus ratify a contract of a municipal corporation for a public purpose.' Sutherland on Statutory Construction, § 483. In any event, it is clear that the mere executive officers of the city could not as late as December 11, 1889, be heard to question the plaintiff company's right to complete its electric lines already commenced."

Again, in the matter of granting authority to street railways to operate lines of roads in the streets of the city, the city of Denver was exercising its proprietary, as distinguished from legislative or governmental, authority, and in respect to the exercise of its proprietary powers the city is bound by the same rule of equitable estoppel as individuals, and where, as in this case, several millions of dollars have been expended and invested by the company in good faith in reliance upon the validity of the ordinance in question, and for the public benefit and welfare of the inhabitants of the city, good faith and honest dealing, in view of these considerations as well as the subsequent ordinances and legislative modifications of the city charter, should estop the city from now asserting that the Tramway Company acquired no rights under said ordinance. Colorado Springs v. Colorado City, 42 Colo. 75, 94 Pac. 316; City Ry. Co. v. Citizens' Railroad Co., 166 U. S. 557–566, 17 Sup. Ct. 653, 41 L. Ed. 1114; Illinois Trust & Savings Bank v. City of Arkansas City, 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518; City of Des Moines v. Street Lighting Co., 188 Fed. 906, 110 C. C. A. 540.

[5] It is urged that the written consent of the owners of the land, representing more than one-half of the frontage of the street, or so much thereof as was sought to be used for railroad purposes, was necessary to be first obtained before the city council had jurisdiction to pass the ordinance in question. The provision of the charter, in this

respect, as heretofore quoted, authorized the city to permit the running of horse railway cars or cars propelled by dummy engines, the laying down tracks for the same, upon the written consent of the owners of the land, representing more than one-half of the frontage of the street, or so much thereof as was sought to be used for railroad purposes. Ordinance No. 3 expressly required, before the company should operate its road upon the streets, that written consent of the owners of the land, as required in the provision of the charter, should be obtained, and the direct question is presented: Was it essential, under the charter, that this consent of the landowners should be obtained before an ordinance could be passed, or was it sufficient if the ordinance provided that the authority therein given should not be exercised until such consent was obtained? The provision in the charter did not expressly require that the consent of the property owners should be obtained before the passing of the ordinance. It was simply a prohibition against permitting the running of cars upon the streets without the consent of the abutting property owners, and it would seem most natural for the council to first pass the ordinance, and then the consent of the property owners obtained, as they would then know, in giving their consent, the kind and character of road to be constructed and the terms and conditions upon which it was to be operated.

In Paterson & Passaic H. R. R. Co. v. Mayor, etc., of Paterson, 24 N. J. Eq. 158–166, it was said:

"Nor can the effect of the action on the part of the city be avoided by the claim that by the true construction of the act the consent of the city was to be based on, and therefore preceded by, that of a majority of the property owners. Such is not the true construction. The consents are independent of each other. The act confers the power on the company to lay the track and operate the road, on condition that the permission of the city (representing the public at large), and of the majority of the owners of property on the street (representing the private interest to be affected), be first obtained. If the consent of the city had first been obtained, it, of course, would not of itself have been sufficient; but it cannot be doubted that, if that being had, the consent of the property owners had been afterwards obtained, the condition precedent to the exercise of the power to lay the rails and operate the road would have been complied with."

The construction thus given to the act in question we think directly applicable to the case under consideration. The charter empowered the city to authorize the construction and operation of the road in the streets of the city, but required the consent of a majority of the landowners to be given thereto. In other words, before any company could operate a road in the streets of the city, it was necessary to obtain the consent of the city, through its duly constituted authorities, and the consent of a majority of the landowners. The consent of the city alone would not authorize the construction and operation of the road upon the streets, neither would the consent of a majority of the landowners alone authorize the same. It required the action of both the city and the landowners. The act did not require that the consent of one should necessarily precede the consent of the other. It was sufficient if, before the road was constructed, the consent of both were

obtained, the city by a duly enacted ordinance, and the landowners by consent in writing. So we think that the ordinance in question, requiring that the consent of the landowners should be obtained before the construction of the road, was a sufficient compliance with the provisions of the charter.

We are cited to some cases which it is claimed announce a contrary doctrine, among them the case of Metropolitan City Ry. Co. v. Chicago, 96 Ill. 620. The act under consideration in that case provided that consent to construct and operate a horse railway in its streets might be granted upon petition of the company, no such consent to be granted, however, unless 10 days' public notice of the time and place of presenting such petition should first be given by publication in some newspaper published in the city or county in which such road is to be constructed. In that case no such notice was given, and it was held that the giving of the notice was jurisdictional to the city giving its consent. The court said:

"The statute intended to give every person interested opportunity for a fair and impartial hearing, that he might appear and be heard at the outset with reference to the committee to which the petition may be referred and before such committee."

It will be seen that the act under consideration in that case expressly provided that the giving of the ten days public notice of the time and place of presenting the petition should precede action by the city. Hence, of course, such notice was jurisdictional.

No case has been called to our attention holding, under language similar to that in the charter of Denver, that the consent is a prerequisite to the authority of the city to pass the ordinance.

[6] On the 1st day of December, 1902, article 20 of the Constitution of the state went into effect. By that article the city of Denver, with a portion of the adjacent outlying territory, became a corporation known as the city and county of Denver, and the inhabitants thereof were empowered to make and adopt their own charter. Appellants say:

"Whenever a municipal corporation enters into a contract silent as to duration with a public utility company for the use of streets, and the consideration of the contract moving from the company embraces, not only the service to be rendered to the general public, but also general obligations to be discharged to the municipality itself, as such, all rights under such contract terminate when the municipal corporation ceases to exist"

—and cite in support thereof People v. Chicago Telephone Co., 220 Ill. 238, 77 N. E. 245; Venner v. Chicago St. Ry. Co., 236 Ill. 349, 86 N. E. 266; Blair v. Chicago, 201 U. S. 400–488, 26 Sup. Ct. 427, 50 L. Ed. 801; People v. Adams, 31 Colo. 476, 73 Pac. 866; Uzzell v. Anderson, 38 Colo. 32, 89 Pac. 785, 1056.

Those cases, while sustaining the proposition as stated by counsel, are not applicable here. The first of the above-cited cases was one where several minor municipalities had granted to a telephone company the right to occupy their streets for its purpose without fixing any limit as to time. After such grants had been made, the minor municipalities were annexed to the city of Chicago. After such an-

nexation, the city passed an ordinance limiting the charges for telephone service. It was held that the minor municipalities, upon becoming annexed to, and made a part of the city of Chicago, ceased to exist as minor municipalities; that grants to the telephone company were not to be construed as perpetual, but terminated upon the life of the corporation granting them.

Blair v. Chicago was a case where the municipality of Lakeview had granted to a street car company certain rights in its streets. Subsequently Lakeview became incorporated into the city of Chicago, and ceased to exist as a municipality. The court said:

"We think in such case that the terms granted would not extend beyond the life of the corporation conferring them, where there was no attempt to confer definite term."

People v. Adams involved the question as to whether or not the fire and police board of the city of Denver continued as the fire and police board of the city and county of Denver, upon the going into effect of article 20 of the Constitution. Section 3 of article 20 provided:

"The terms of office of all officers of the city of Denver and all included municipalities, and of the county of Arapahoe, shall terminate, except that the * * * fire and police boards of the city of Denver shall become respectively said officers of the city and county of Denver, and shall hold the said offices, as above specified only until their successors are duly elected and qualified, as herein provided for."

Section 4 provided:

"The charters and ordinances of the city of Denver, as the same shall exist when this amendment takes effect, shall, for the time being only, and as far as applicable, be the charter and ordinances of the city and county of Denver."

It was held that the fire and police board of the city of Denver continued as the fire and police board of the city and county of Denver.

A more applicable case is Vilas v. City of Manila, 220 U. S. 345, 31 Sup. Ct. 416, 55 L. Ed. 491. That was an action brought by certain creditors of the city of Manila as it existed before the cession of the Philippine Islands to the United States, upon the theory that the city, under its present charter from the government of the Philippine Islands, was the same juristic person and liable upon the obligations of the old city. The Supreme Court of the Philippine Islands denied relief, holding the present city of Manila to be a wholly different corporate entity, and in no way liable for the debts of the Spanish municipality. Mr. Justice Lurton, writing the opinion, said:

"The contention that the liability of the city upon said obligation was destroyed by a mere change of sovereignty is obviously one which is without a shadow of moral force, and, if true, must result from settled principles of rigid law. * * * If we understand the argument against the liability here asserted, it proceeds mainly upon the theory that inasmuch as the predecessor of the present city, the ayuntamiento of Manila, was a corporate entity created by the Spanish government, when the sovereignty of Spain in the islands was terminated by the treaty of cession, if not by the capitulation of August 13, 1908, the municipality ipso facto disappeared for all purposes.

This conclusion is reached upon the supposed analogy to the doctrine of principal and agent, the death of the principal ending the agency. * * * We are unable to agree with the argument. It loses sight of the dual character of municipal corporations. They exercise powers which are governmental and powers which are of a private or business character. In the one character a municipal corporation is a government subdivision, and for that purpose exercises by delegation a part of the sovereignty of the state. In the other character it is a mere legal entity or juristic person. In the latter character it stands for the community in the administration of local affairs wholly beyond the sphere of the public purposes for which its governmental powers are conferred. * * *

"Was corporate identity and corporate liability extinguished as a necessary legal result of the new charter granted in 1901 by the Philippine commission? The inhabitants of the old city are the incorporators of the new. There is substantially identity of area. There are some changes in the form of government and some changes in corporate powers and methods of administration. The new corporation is endowed with all of the property and property rights of the old. It has the same power to sue and be sued which the former corporation had. There is not the slightest suggestion that the new corporation shall not succeed to the contracts and obligations of the old corporation. Laying out of view any question of the constitutional guarantee against impairment of the obligation of contracts, there is, in the absence of express legislative declaration of a contrary purpose, no reason for supposing that the reincorporation of an old municipality is intended to permit an escape from the obligations of the old, to whose property and rights it has succeeded. The juristic identity of the corporation has been in no wise affected, and, in law, the present city is in every legal sense the successor of the old. As such it is entitled to the property and property rights of the predecessor corporation, and is, in law, subject to all of its liabilities.

"In Shapleigh v. San Angelo, 167 U. S. 646–654 [17 Sup. Ct. 957, 959 (42 L. Ed. 310)], this court said in a similar case: 'The state's plenary power over its municipal corporations to change their organization, to modify their method of internal government, or to abolish them altogether is not restricted by contracts entered into by the municipality with its creditors or with private parties. An absolute repeal of a municipal charter is therefore effectual so far as it abolishes the old corporate organization; but, when the same or substantially the same inhabitants are erected into a new corporation, whether with extended or restricted territorial limits, such new corporation is treated as in law the successor of the old one, entitled to its property rights, and subject to its liabilities.'"

So here the city and county of Denver was but a reincorporation of the city of Denver, with some extended territory. The first section of said article 20 provided:

"The municipal corporation known as the city of Denver, and all municipal corporations, and that part of the quasi corporation known as the county of Arapahoe, in the state of Colorado, included within the exterior boundaries of the city of Denver, as the same shall be bounded when this amendment takes effect, are hereby consolidated and are hereby declared to be a single body politic, and corporate, by the name of the city and county of Denver. By that name said corporation * * * shall succeed to all the rights and liabilities, and shall acquire all benefits, and shall assume and pay all bonds, obligations and indebtedness of the city of Denver and of said included corporations, and of the county of Arapahoe. * * *".

After said article went into effect, the city and county of Denver adopted a charter. Section 348 contained, among other things, the following provision:

"All rights, liabilities, obligations, suits, actions, prosecutions, claims and contracts of the city of Denver, the former county of Arapahoe, the included municipalities, and the city and county of Denver, shall remain and continue

in full force and effect, as if the form of government had not been changed and this charter adopted."

In view of these constitutional and charter provisions, we do not think it admits of doubt that the city and county of Denver was a change only in governmental form under a new name, and succeeded to all the rights and assumed all the liabilities, of the old city of Denver.

The question of the duration of the grant to the Denver Electric & Cable Railway Company, its successors and assigns, under said Ordinance No. 3 of 1885, has been extensively argued. On the part of complainant it is urged that the grant is one in perpetuity. On the part of the city, it is insisted that it was not a grant in perpetuity, as such grant the city could not validly bestow, and the rights of the Denver Electric & Cable Railway Company under Ordinance No. 3, 1885, were those only of a licensee.

A similar question was before this court in Omaha Electric Light & Power Co. v. City of Omaha, 179 Fed. 455, 102 C. C. A. 601. In that case it was held that, there being no time limit for the existence of the grant mentioned in the ordinance, it was not intended to grant a perpetual franchise, but was a grant during the life of the corporation grantee; that its assigns or successors thereafter would hold and enjoy the same at the will of the city only. By adhering to that decision we should be required to hold that the grant acquired under Ordinance No. 3 of 1885 continued until 1935, the corporate life of the Denver Electric & Cable Railway Company. But, as that case is now pending in the Supreme Court of the United States, and the rights of the complainant are fully protected by Ordinance No. 74 of 1906 until 1926, it is unnecessary for the protection of claimant's rights, and we think inexpedient, that that question be determined at this time. So the duration of the grant under said Ordinance No. 3 we leave without determination.

[7] Again it is said on the part of the city that the ordinance being a blanket one, granting to the railway company the right to construct its road upon any and all of the streets of the city as it might in the future elect or choose to do, is void. A consideration of this question leads us to the conclusion that every grant of the character in question must be reasonable with respect to future public rights; that a grant that is exclusive in its character, or a grant in perpetuity to all of the streets which the grantee may from time to time in the future see fit to occupy, is unreasonable and unenforceable in the absence of express legislative authority. See, as bearing upon this subject, Citizens' St. Ry. Co. v. Jones (C. C.) 34 Fed. 579; Knoxville v. Africa, 77 Fed. 501, 23 C. C. A. 252; Logansport Ry. Co. v. City of Logansport (C. C.) 114 Fed. 688; Citizens' St. Ry. Co. v. City of Memphis (C. C.) 53 Fed. 715; Indianapolis Cable Ry. Co. v. Citizens' St. R. R. Co., 127 Ind. 369, 24 N. E. 1054, 26 N. E. 893, 8 L. R. A. 539; Citizens' St. R. Co. v. City Ry. Co. (C. C.) 64 Fed. 647; s. c., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114; City of Houston v. Houston St. Ry. Co., 83 Tex. 548, 19 S. W. 127.

Such provision, however, does not render the entire grant void. It

is a valid contract as to all streets which are actually occupied or in contemplation of occupancy, pursuant to a system adopted with a view of completion in the immediate future. As the term or duration of the franchise is not determined at this time, for reasons before given, and as we think the provision in the ordinance granting the right to all of the streets of the city is dependent for its validity largely upon the duration of the franchise, we refrain from now passing upon the scope of the grant.

It is said, however, that no decree should have been entered in favor of complainant, for the reason that the bill filed by complainant only sought to enjoin the passage of an ordinance, and that the courts are powerless to prevent legislative action. As a general proposition, courts are not authorized to interfere with legislative discretion, and municipal corporations when in the exercise of legislative powers, relative to subjects over which the municipality has jurisdiction, cannot be restrained in the exercise of such power in advance of its completed exercise.

In Chicago, R. I. & P. Ry. Co. v. City of Lincoln, 85 Neb. 733, 124 N. W. 142, 19 Ann. Cas. 207, the above rule was fully recognized, but it was said:

"To this general rule, however, there are the following exceptions. Where the mere passage of the ordinance would ordinarily occasion or would be followed by some irreparable loss or injury, beyond power of redress by subsequent judicial proceedings, or when it would cause a multiplicity of suits, the passage of the ordinance may be enjoined."

It may be well said in this case that the natural effect of the passage of such a repealing ordinance would greatly depreciate the value of the bonds for the security of which complainant holds its mortgages as trustee. The repealing ordinance not calling for any affirmative action, complainant would be powerless to obtain redress until there was some threatened action upon the part of the municipality to interfere with the operation of the road. Yet, in the meantime, it would cast such a cloud upon the title of the Tramway Company as necessarily to greatly depreciate the securities. And, while it is probable that the Tramway Company could maintain an action to quiet its title (Blair v. Chicago, 201 U. S. 400, 26 Sup. Ct. 427, 50 L. Ed. 801), complainant, having an equitable title only, and not having possession of the property, could not maintain such action.

On the part of complainant it is said that as this Ordinance No. 3, 1885, did not relate to the governmental powers of the city, but to powers which were of a private or business character, the rule above stated that a municipal legislative body may not be enjoined from passing an illegal ordinance does not apply. This contention seems to have support in the case of Poppleton v. Moores, 62 Neb. 851, 88 N. W. 128, and Id., 67 Neb. 388, 93 N. W. 747.

But these questions we are not required to pass upon in this case, as the decree of the court below did not enjoin the passage of Ordinance No. 65.

[8] It is further said that the decree, in so far as it sought to enjoin the enforcement of Ordinance No. 76 of 1899, was erroneous, in that

said ordinance was passed subsequent to the filing of the bill, and no supplemental bill was filed asking for such relief. The scope and purpose of the bill, however, was to enjoin the city from attempting to impair the contract right claimed under said Ordinance No. 3 of 1885. The passage and effect of Ordinance No. 76 of 1899 was brought into the case by the amended answer filed by respondents, and we think the rule well settled that the court may grant relief as to matters occurring subsequent to filing the bill, without a supplemental bill being filed, if within the scope of the original bill, when such subsequent matters are presented by defendants in their answer and proofs. Cavender v. Cavender, 114 U. S. 464, 5 Sup. Ct. 955, 29 L. Ed. 212; Richardson v. Green, 61 Fed. 423–431, 9 C. C. A. 565; Simkins Federal Suit in Equity (2d Ed.) 432.

It follows from what has been said that the decree of the court below should be modified by omitting therefrom any adjudication as to the duration and scope of the contract based upon Ordinance No. 3 of 1885. The city still insisting upon its right to enforce Ordinance No. 76 of 1899, it should be enjoined from so doing until May 17, 1926, on the expiration of Ordinance No. 74 of 1906, but without prejudice to the rights of the complainant or the city and county of Denver or the Denver City Tramway Company from bringing or maintaining an action either to quiet title or by quo warranto or other appropriate legal or equitable proceeding to determine the duration and scope of the rights granted and acquired under said Ordinance No. 3 of 1885.

The case is remanded to the court below, with directions to modify the decree in accordance herewith.

CARLAND, Circuit Judge (dissenting). Some questions arising upon the record are decided in the majority opinion. The most important, however, are left undecided. On the facts appearing in the record, I am of the opinion that nothing should be decided, the judgment reversed, and the case remanded, with instructions to dismiss the bill without prejudice.

The bill was filed in the court below on May 24, 1899. It was brought by complainant for the purpose of enjoining the passage of aldermanic bill No. 65 by the board of aldermen and the board of supervisors of the city and county of Denver. On the filing of the bill, a motion for a temporary injunction was made and granted. On June 9, 1899, an appeal was allowed to this court, and on May 8, 1900, the order appealed from was affirmed.

On May 15, 1906, by vote of the people of the city and county of Denver, the Denver City Tramway Company was granted a franchise over, upon, along and across certain streets, alleys, viaducts, public ways, and places in the city and county of Denver, said franchise specifying the terms and conditions thereof. The ordinance granting said franchise is numbered 74, and is set out in the record at pages 665 to 686. This ordinance, it is true, preserved the rights of both parties as to matters in controversy at the time of its passage, but it fixed irrevocably for the period of 20 years the relations of the Tramway

Company and the city and county of Denver, so that any order made in this action could have no effect whatever upon the relations of the Tramway Company and the city and county of Denver for approximately 14 years.

The mere fact that the city and county of Denver claims that Ordinance No. 76 is a valid ordinance, and that the Tramway Company claims that the ordinance of 1885 is valid, does not, in my opinion, authorize this court to proceed and determine questions which will not become acute for 14 years and perhaps never. If the city and county of Denver and the Tramway Company can arrange their affairs for 20 years, at the end of 20 years it may be reasonably presumed that they can again arrange them. At least, there is no such present necessity for deciding any question raised upon the record as to make it desirable for the court to act in the premises.